# W. C. CRAWFORD ET AL. v. J. F. GROSS ET AL.

APPEAL BY THE PHILADELPHIA BUTCHERS' HIDE & TALLOW ASSOCIATION FROM THE COURT OF COMMON PLEAS NO. 2 OF PHILADELPHIA COUNTY.

Argued January 14, 1891—Decided March 2, 1891.
[To be reported.]

(*a*) An unincorporated business association purchased real estate through trustees, appointed by it to receive the title, to whom the property was conveyed expressly in trust to hold the same for the use and subject to the control of said association and the persons from time to time composing the same.

(*b*) A part of the purchase money of the property was secured by mortgage, and a part was paid in cash by the treasurer of the association from a fund contributed by certain of the members who received therefor certificates of "stock" in the association. Afterwards, a consolidation with another like organization took place.

(*c*) Subsequent to the consolidation, the certificates were surrendered by the holders, and in lieu thereof new certificates were issued by the consolidated association, stating that the holders were entitled to so many "shares in the real estate of the . . . . , association, at $25 per share, transferable . . . . . on the books of the association: "

1. The consolidated association was the equitable owner of the property. The contributors toward its purchase had no proprietary interest therein, but their certificates were an informal pledge of the real estate, to secure the re-payment of the sums so contributed by them, and constituted an equitable lien upon the property.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 307 January Term 1890, Sup. Ct. ; court below, No. 57 December Term 1881, C. P. No. 2.

On December 16, 1881, William C. Crawford and others, "for themselves and such other persons, being members of the Philadelphia Butchers' Hide & Tallow Association, as may become parties to this bill," filed a bill in equity against John F. Gross, John A. Houseman, Daniel Williams and others. The bill averred that two parcels of real estate, particularly described, situated in the city of Philadelphia, were held in trust by certain of the defendants, for the use and benefit of the association composed of the plaintiffs and their associates, and that the defendants were fraudulently combining and endeavoring to dispossess and deprive the plaintiffs of said premises; praying for an injunction and for general relief.

The defendants answered the bill; and John F. Gross, John A. Houseman and Daniel Williams, the defendants who were named in the bill as trustees of the title to the properties in question, filed a cross-bill against the plaintiffs and others, averring that the members of the Philadelphia Butchers' Hide & Tallow Association were not all interested in the real estate described in the bill, but only certain persons who had contributed towards its purchase or were the successors of such contributors, and who were holders of certificates of stock issued for such contributions, praying that the court would decree who were the cestuis que trust under the deeds by which the properties were held, and for general relief.

The cross-bill having been answered, and issue having been joined upon each bill, the cause was referred by the court to *Mr. A. Wilson Norris*, as master, who found in substance the following facts:

In 1848 and 1849, some thirty or forty butchers of the county of Philadelphia came together, and formed an association to salt the hides of the cattle they slaughtered. This association was variously called: the Hide Association, the Beef Butchers' Hide Association, the Philadelphia Butchers' Hide Association, the Beef Butchers' Hide Association of Philadelphia, the Beef Butchers' Association, and the Beef Butchers' Association of the city and county of Philadelphia.

There was at that time little, if any, formality required to become a member of the association. Butchers were permitted to bring their hides and deposit them with the employees of

the association, and they thereby became members. Afterwards, it was necessary for the butcher, who desired to join the association, to apply to a member who was a depositor, and still later it was required that he should apply to a member of the board of trustees, and his hides were not received unless he was recommended by said trustee. The membership was frequently changed by the withdrawal of some butchers and the admission of others. There were no conditions at that time imposed upon a member, when admitted, other than that he should deposit his hides, and subsequently to the formation of the melting association, both his hides and fat, with the association.

The butchers, who thus associated, elected from their number a board of thirteen trustees, whom they charged with the conduct of the business. This board selected from their number a president, treasurer and secretary of the association.

Finding that they could not renew the lease of the building in which the business of the association was carried on, the board of trustees on September 17, 1849, adopted a resolution " on motion of Mr. Alexander, that the trustees recommend to the butchers the purchase of the building used as a salting-house, and recommend each butcher interested to subscribe each to one share bearing six per cent interest."

In pursuance of this plan, as appeared by the minutes of the meeting of the board of trustees of September 24, 1849, a resolution was passed " on motion of Mr. Alexander, that Mr. John F. Gross, Mr. Henry Aykroyd, and John A. Houseman be a committee to purchase the salting-house of Mr. Lex, for the butchers that subscribe to the stock." At the same meeting a committee was appointed to wait upon the butchers and receive subscriptions to the stock. Only a portion of those who were members of the association subscribed. It was not made incumbent on the members to subscribe, and their failure to do so in no way affected their rights as members. Nor did the subscription enlarge the rights of the subscribing members. The form of the subscription was in these words:

" Subscriptions to stock in the Beef Butchers' Hide Association of Philadelphia for the purpose of raising the sum of $11,500, to be applied to the purchase of a certain lot of ground, and building thereon erected, situate on the south side of Wil-

Statement of Facts.

low street, west from Eleventh street, in which to carry on the business of the association:

"The subscribers, whose names are hereto affixed, agree to pay to the trustees of the Beef Butchers' Hide Association of Philadelphia the sum of twenty-five dollars for each share of stock set opposite their respective names. The said amount to be paid in annual instalments of five dollars on each share of stock, on the first day of January in each year succeeding the date hereof, for which they are to receive from said trustees a certificate or certificates which shall express the number of shares taken, and the amount paid on each share of stock provided for."

The subscribers on making their first payment upon the subscription, received a certificate in the following form:

$25.                                        No. 62.

THE BEEF BUTCHERS' HIDE ASSOCIATION OF PHILADELPHIA.
        Capital  . . . . . . . . . . . $11,500.

This is to certify that Daniel Houseman is entitled to five shares in the stock of the Beef Butchers' Hide Association of Philadelphia, on which five dollars per share have been paid, subject to all payments due or to become due thereon.

Transferable in person or by attorney, in presence of the president or secretary of the association.

HENRY AYKROYD, President,
JOHN A. HOUSEMAN, Secretary.

At a meeting of the association held on December 13, 1849, a resolution was adopted, directing "that the names of John F. Gross, William Keichline and John A. Houseman be inserted in the deed of trust about to be executed of the salting house," and on February 4, 1850, said property, thereafter designated indifferently by the terms "salting house" and "hide house," was conveyed by Elizabeth and Anna M. Lex, the vendors, in consideration of $11,500, to Messrs. Gross, Keichline and Houseman, upon trusts declared in the deed as follows:

"In trust, nevertheless, to, for, and upon the several uses, intents and purposes following: that is to say, in trust to stand seised of the said hereinabove-described premises, to and for the only proper use and benefit of the association known by the name, style, and title of the Beef Butchers' Association of

Statement of Facts.

the city and county of Philadelphia aforesaid, and for such person or persons as shall from time to time compose the same, and for the uses, object, and purposes, and subject to the control of the said association; and upon the further trust, upon the incorporation of the said association, to grant, convey, and assign the said described premises and every part thereof, with the appurtenances, unto the said corporation, their successors and assigns forever."

The deed provided further that the trustees and their survivors might execute and deliver bonds and mortgages to secure the payment of the purchase money,* or other encumbrances that might from time to time be directed by said association, and that they should have full power and authority, upon the direction of said association, to convey said property in fee-simple, free from all right, title, interest and claim whatsoever of said association or any member or members thereof.

In 1854, the following form of certificate was issued to subscribers:

No. 145.                                                   $300.00

This is to certify that Daniel Houseman has contributed the sum of $300 toward the purchase by the undersigned, as trustees for the association known by the name, style, and title of the Beef Butchers' Association of the city and county of Philadelphia, of the lot and buildings on the south side of James street, . . . . . for which sum we agree to pay interest at the rate of six per cent per annum out of the rents and income of the said property.

WM. KEICHLINE,
JOHN F. GROSS,      } Trustees.
JNO. A. HOUSEMAN,

PHILADELPHIA, 4th mo. 1, 1854.

It was manifest, the auditor found, that this was the certificate which was issued when the subscribers to the purchase of the salting house had paid up all their instalments, as a substitute for the certificates previously issued to them.

---

* The master found in his report that purchase money mortgages were given for a part of the price of this property, but did not find what proportions of it were paid in cash and secured by mortgage, respectively. Purchase money mortgages thereon for sums aggregating $6,000 appear to have been put in evidence.

Statement of Facts.

The business of salting the hides proving profitable, the butchers of the association decided they would form another association for the purpose of rendering the fat of the cattle they killed. Into this association they received mutton butchers, but the association was in the main composed of the beef butchers who comprised the original association for salting hides.

This association, likewise, had various names, being indiscriminately called the Fat Association, the Melting Association, the Beef & Mutton Butchers' Tallow Association, the Beef & Mutton Butchers' Melting Association of Philadelphia, the Beef & Mutton Butchers' Tallow Association of the City and County of Philadelphia.

This new association had also a board of trustees which was constituted of the same persons as were in the board of the hide association, except that the board of the melting association contained two mutton butchers. This board, also, elected its own president, treasurer, and secretary.

The same men acted for both associations, but in a separate capacity for each institution. The business and accounts of the two associations were kept separate, so as to show the interest of each member therein.

For the purpose of its business said association also purchased a building, which was thereafter called the "melting-house" or the "fat-house."*

At the commencement of the business of rendering fat, the sum of $6,175 had been raised by subscription among the members of the association. Of this amount $3,000 were paid in cash on account of the purchase money, and the balance, $9,000, in a mortgage. The remainder of the $6,175 was invested in fixtures, and in the expenses necessary to begin the business of the melting association.

To the subscribers of this fund of $6,175, a certificate was given in the following form:

---

* The deed for this property was in evidence. It was made to John F. Gross, Daniel Williams and William Keichline, "trustees for the association known by the name, style and title of the Beef & Mutton Butchers' Tallow Association of the City and County of Philadelphia." It declared the terms of the trust and the powers of the trustees in precisely the same form and manner as the deed made to the trustees of the Beef Butchers' Association.

$20. No. 12.

BEEF & MUTTON BUTCHERS' MELTING ASSOCIATION OF
PHILADELPHIA.

This is to certify that Mr. John Alexander has paid for two
shares of stock of the Beef & Mutton Butchers' Melting As-
sociation of Philadelphia, at ten dollars per share (twenty dol-
lars), and on which the holder hereof is entitled to demand
and receive six per cent interest, payable annually on the first
Monday of April in each year.

Dated February 17, 1851.

WILLIAM KEICHLINE, President.
JAMES A. GOWIE, Secretary.

[Not transferable to any person or persons except to a beef
or mutton butcher.]

The above balance of $3,175 was paid into the association in
1853, and had been carried in the treasury ever since.

The hide association and the melting association subsequently
merged or consolidated and became what is now known as the
Philadelphia Butchers' Hide and Tallow Association. One
board of trustees, and a president, treasurer, and secretary,
annually elected by this board of trustees, have since conducted
the combined business, the board thereafter consisting of fifteen
members, five of whom were elected every year. The board
of trustees, thus annually elected, and the officers chosen by
them, have been ever since in possession of the property and in
charge of the business.

In 1862 and thereafter, certificates in the following form
were given to those who held the scrip or stock:

No. —— —— Shares.

THE PHILADELPHIA HIDE & TALLOW ASSOCIATION.

This certifies That      is entitled to      shares in the
real estate of the hide-house property of the Philadelphia Hide
& Tallow Association, at twenty-five dollars per share amount-
ing to      dollars, transferable in person or by attorney on
the books of the association.

Witness the signatures of the president and secretary at
Philadelphia,

A. D. 186

Secretary. President.

Precisely similar certificates were issued to those who held

Statement of Facts.

stock in the fat-house, with the exception that instead of the words, " shares in the real estate of the hide-house property" they read, "shares of real estate of the fat-house property."

These certificates were evidently made to be signed by the president and secretary of the Philadelphia Hide & Tallow Association. They were, however, variously signed; some of them by the president and secretary, some by the president and treasurer, some by the trustees, etc.

The association continued to pay interest each year to certificate holders. The rate of interest varied, more than six per cent being paid a part of the time.

An agreement establishing rules and regulations for the government of the consolidated association was adopted, which all members, old and new, were required to sign. By § 1, article xv., certain admission charges were imposed on all persons becoming members after January 1, 1877, and § 2 provided as follows :

" § 2. The funds raised under § 1 of this article shall be held for the purpose of making improvements and extensions to our places of business, and for providing permanent fixtures and implements not properly coming under the head of current expenses for carrying on the business."

The contributions for the purchase of the hide-house and the fat-house were paid directly into the treasury of these respective associations. The payments on account of the purchase-money were made by the officers of these associations. The mortgages, which were made in part payment of the purchase-money, were executed by the trustees designated by the board of trustees of these respective associations. All the improvements were made under the direction of the board of trustees of the hide or fat departments, and out of the funds of these associations. The sum of $3,175 was taken out of the fat-house funds for fixtures, when the building for that association was purchased. The funds for improvements were taken out of the dividends of the depositors. From the admission fund, after the year 1877, very extensive and valuable improvements were made for the purpose of rendering oil, and these improvements were of a permanent character. An engine-house was built; the whole building was strengthened for the reception of the machinery, and a culvert was constructed. A portion

of this admission fund, which was received in the hide-house, was used in the improvement of the fat-house property. The money for the improvement of the fat-house was also taken from the admission fund of the sheep butchers, although they had no interest in the rendering of oil. The improvements to the fat-house aggregated $14,000, and the fixtures $8,000 additional. The repairs to the buildings were also made by the association out of its funds. The taxes were also paid in the same way out of the same funds. So also the interest on the mortgages and the interest due on the certificates. In no way was it shown that any other association or any officer other than one of the association ever paid for improvements, fixtures, taxes, insurance, repairs, or interest, or, if there was, it was by some one acting for an officer of the association. There did not seem to have been any difference in the form of subscriptions or the certificates, and the money so raised was applied without any distinction to the purchase of the building or the procurement of fixtures. In a like manner, the money raised by admission fees was also applied indiscriminately to the improvement of either building irrespective of the fund out of which it came.

There was some evidence that meetings of the stockholders were held, but no minutes or books of any stockholders' organization, such as were alleged to have existed, were produced. That the beef butchers' association named in the deed of trust was an association of stockholders, was nowhere shown by the evidence other than by the statements of witnesses that they understood and believed that the stockholders were the owners of the property, and that it was intended that the property should be held by the trustees in the deed for the benefit of those who held the stock. On the contrary, the evidence of complainants' witnesses was just as positive that the properties were always considered to be owned by the association, and that they never had any claim to the real estate by virtue of their stock; that the properties were bought for the association, and that they never thought they had any ownership or control over the real estate by reason of their stock, other than that possessed by any other member of the association who was not a stockholder. Members sold and re-purchased the stock, and did not think their rights in any way affected thereby. With most of the

Master's Report.

subscribers the money was not paid at the time of the subscription, but was taken out of their dividends running over a period of several years. The certificates that were issued were printed and issued by officers of the association for salting hides or rendering fat.

Upon the facts found by him, the master reported his opinion in part as follows:

The defendants in the original bill and the complainants in the cross-bill, contended that the Beef Butchers' Association and the Beef & Mutton Butchers' Tallow Association, named in the deeds of trust for the hide-house and fat-house respectively, are not the same associations as the Beef Butchers' Hide Association and the Beef & Mutton Butchers' Tallow Association, but entirely different associations, composed only of those who are stockholders; that these stockholders are either the original subscribers or the successors of those who originally subscribed to the purchase of the buildings in use by the hide and fat associations; that the persons who thus subscribed purchased said properties and are the owners of them; that the trustees named in the deeds were the trustees for said purchasers; that it was never contemplated nor intended that those who were simply depositors in either the hide- or fat-house should participate in the benefits arising from these purchases; that said depositors were merely the lessees of said purchasers and had agreed to pay the amount of interest named in the certificates of stock held by said purchasers, together with the insurance, taxes, repairs, etc., upon said properties, as the rental for the same; that the certificates which said stockholders held defined the character and extent of the holder's interest in said real estate, it being distinctly set forth therein that the holder was entitled to so many shares in the real estate of the hide- and fat-house property; that the stockholders were a separate association and were considered and treated as the owners of the real estate, and that this association of stockholders was the association called the Beef Butchers' Association in the hide-house deed, and the Beef & Mutton Butchers' Tallow Association in the fat-house deed, and are the cestuis que trust intended by said deeds. . . . . .

It cannot be successfully contended that the identity of a

distinct association from the depositors' association is shown by the fact that the name in the deed differs from the name of the latter association, for so many different names were used that it is impossible to conclude which was the exact name of the depositors' association. The different names in the certificates, the various names by which it was called by the members, all go to establish the fact that it had no uniform title, and that the name in the deed, the Beef Butchers' Association of the City and County of Philadelphia, was as likely to be adopted as any of the other numerous names by which the association was known. Before we are precluded from assuming that this was its name, should it not be shown that there was another and different association, which was known by this name and which had a recognized existence?

There was no evidence to sustain the allegation that the stockholders had regular meetings and had a separate entity as an association, other than the statements of witnesses that they were present at such meetings; and their recollections of them were vague, and certainly not of a character to justify a master in concluding that the stockholders were the identical association intended by solemn instruments of writing like the deeds of trust in this case. If these stockholders had a separate association which consisted only of those who had stock, and they considered themselves the owners of the real estate in dispute, is it reasonable to suppose they would not have some documentary evidence of their existence and their acts? If such a separate association existed, is it not to be presumed it had books and accounts and continuous memoranda that would have contained some evidence of their ownership of the property? Nor is there any evidence that such an association had any officers to look after and watch over their interests. It is probable there were times when those members of the association who held this stock may have met to consider some questions affecting their interests, but certainly if they owned these properties in question they have left no record to show any of the indicia of ownership, and none of their acts indicate that they assumed to control the properties or dictate the uses to be made of them. There is no contemporaneous evidence of any character to show that it was in the contemplation of any one that these deeds were to be made to the use of those who

### Master's Report.

contributed to the purchase, and were to be for the benefit of those who held the stock. Every act leading up to the purchase, and every act following in the improvement and care of the properties to the present day, has been the act of the association, through its properly accredited officers; and, after thirty years of uninterrupted possession and the expenditure of large sums of money in improvements and repairs, the stockholders who appear to have no existence, except by virtue of the certificates they hold, now claim they are the owners of the real estate and are entitled to take possession of it, and that they are the cestuis que trust named in the deeds.

Permanent improvements, in the nature of fixtures and extensions to the buildings, have been paid for with funds realized by taking the amount pro rata from the dividends of the depositors. Are the permanent benefits to the real estate thus made to go to the stockholders? Can it be argued that the depositors would thus permit their money to be taken for the improvement of the real estate of the stockholders, with no provision for reimbursement and with no recognized or existing organization or association that could provide for such reimbursement? If the stockholders were considered and treated as the owners of the real estate, is it reasonable to suppose that the depositors, year after year, would allow money to be deducted from their dividends, not only to pay the purchase money for the real estate, but to continuously put permanent improvements thereon?

Under article xv. of the agreement, to be found in the history of the case, it will be seen certain admission charges were imposed upon every new member, and the funds thus raised were to be held for the purpose of making improvements and extensions to the places of business, and for providing permanent fixtures and improvements not properly coming under the head of current expenses for carrying on the business.

Does not this article of the agreement, which was adopted by the depositors, many of whom were stockholders, and which was handed to every new member, and which he was required to sign before he became a member, preclude any other conclusion than that the depositors' association was the owner of the real estate? The old and the new members, when they signed that agreement, certainly did not think they were becoming par-

ties to a contract to improve and provide permanent fixtures to
the real estate of the stockholders. If there had been any pre-
vious doubt about the ownership of the real estate, this agree-
ment, made in 1877, to which the depositors and stockholders
were parties, and wherein the depositors' association asserted its
ownership of the real estate and made provision for its perma-
nent improvement, ought to conclude the parties thereto and
estop them from setting up a claim of ownership in conflict
with that which is in this agreement so distinctly affirmed.

It is true, a number of the witnesses of the complainants
testify that the stockholders were regarded as the owners, and
were so considered and treated; but a number of the witnesses
of defendants just as positively declare that the association
was considered the owner, and that no question as to the own-
ership had ever been raised until this controversy arose. A
master certainly would not have any warrant for determining
who were the cestuis que trust in these deeds, if he was to rest
his decision on this parol testimony, which is the mere opinion
of both parties, who are equally positive that they are right.
For thirty years no controversy arose in regard to the owner-
ship. During all this time the depositors' association was in
the use and enjoyment of the properties, making such changes
therein as would adapt them to its business, expending large
amounts of money upon improvements and repairs, exercising
all the acts of an owner; and in all these years there are but
two or three transactions which may be regarded as the exer-
cise of such a right upon the part of the stockholders.

The master cannot find any evidence to show that when the
property was purchased an association was then formed, com-
posed exclusively of stockholders; and there is no room what-
ever for the contention that at that time all the depositors
were subscribers, and therefore the acts of the depositors' asso-
ciation were the acts of the stockholders, for not even a major-
ity of the depositors were subscribers to the fund to purchase
the property. All the acts of the members and the records
contemporaneous with the purchase, point to the transaction as
one intended to be for the benefit of those engaged in the salt-
ing of hides. The motive for the purchase was to provide a
permanent place for their business, which it had been demon-
strated was profitable. When, therefore, they could no longer

Master's Report.

rent the building, they determined to buy, and their authorized officers proceeded to negotiate and purchase. And so earnest were they in their purpose that they deliberated over the advisability of becoming incorporated, so as to place their rapidly growing business on a permanent basis. When, likewise, they came to make the trust, they declared that it should be for the benefit, not only of the then existing association, but of those who should from time to time compose the same, not only for them, but also in case of their incorporation, then in trust for such incorporated association. Thus, the business association incorporated was contemplated, and it is therefore clear that this association, whether incorporated or unincorporated, was intended. All these acts and declarations are consistent with the purchase for the depositors' association, and to provide for those who were to become members thereafter; but there is in them all not a word or act to show that these transactions were the preliminary moves in the formation of an association of butchers to hold real estate to rent to the depositors' association. . . . .

In the opinion of the master the certificates themselves establish the claim of the business association to the property. The first certificate issued in 1851 by the Beef Butchers' Hide Association of Philadelphia, states that the capital is $11,500, the exact amount paid for the property. This certificate is signed by Henry Aykroyd, as president, and John A. Houseman, as secretary, those gentlemen being at that time respectively the president and secretary of the depositors' association. Nothing whatever is here said about shares in the real estate, but it is simply a certificate of shares of stock in the Beef Butchers' Hide Association of Philadelphia. This, it must be conceded, was issued by the business association, and over the signatures of its president and secretary. The recital therein of the amount of capital, viz., $11,500, would seem to imply that the association intended that the property should be a security for the payment of the amount of the certificate. No stipulation for interest is contained in this certificate, as by its terms it appears to be an instalment certificate, and the payment of interest was doubtless reserved until the full amount was paid in. This appears more clearly when we look at the certificate of the Beef & Mutton Butchers' Melting Association, where the full

amount is paid when the shares are taken, and which, in like manner, recites that it is for shares in the stock of said association, but stipulates that six per cent interest is payable thereon annually on the first Monday of April in each year. This certificate is signed by William Keichline, the president, and James A. Gowie, the secretary, respectively, of said association. There is certainly nothing in either of these certificates to indicate that the holders thereof were the owners of the real estate. It might with propriety be argued that by the stock of the association was meant the real estate, and that the association intended that the property should be held as security for the debt; but surely no broader inference could be drawn from the terms of the certificates, and even that might be said to be strained.

The certificate of 1854 was in the name of the Beef Butchers' Association of the city and county of Philadelphia. It certifies that the person named therein has contributed a certain amount towards the purchase by the undersigned for the above-named association of the property described, which was the hide-house, for which they agreed to pay six per cent per annum out of the rents and income of the said property. This was signed by the then trustees in the deed. It is manifest that this was the certificate which was issued when the subscribers to the purchase of the hide-house had paid up all their instalments. It was contended that the certificate was evidence of a distinct association from the one for salting hides; that the name therein was the name in the deed of trust, and that the trustees who signed the same were the trustees named in the deed, and therefore it was not the certificate of the business association. It is evident, however, that the trustees did not in their individual capacity undertake to pay, but for the association, and the question again occurs, what association? Manifestly, the business association; for Mr. Bonsall, the assistant secretary of the association, in speaking of this certificate, testified that it was a certificate for the whole amount of the holder's subscription, but that there were other certificates, issued after this, intended to supersede all that had been issued before, which defined the character of the subscriptions particularly; that these last certificates were what was called the regular certificates of stock; that there was some little difference in the signing of them,

but the very last was signed by the president and secretary of the Philadelphia Hide & Tallow Association; that the holders of the other certificates were to surrender them and they were to be canceled, and in lieu thereof a certificate was issued signed by the president and secretary of the association.  Now, these last certificates, as will have been observed, certified that the holder was entitled to so many shares in the real estate of the hide- or fat-house property, accordingly as the previous certificates had been issued by either the hide or tallow association.  The manifest intent of these certificates was to call in all the certificates and to issue in their stead, as Mr. Bonsall says, other certificates which would define more particularly the character of the subscriptions, and this was doubtless the purpose when the words "shares in the real estate of the hide-house or fat-house property" were inserted; not to declare that the holder was entitled to so much of the real estate, but that the amount of money which he contributed was secured by the one or the other of the properties to the amount of his subscription; not that he was a part owner of that particular real estate, but that said real estate was bound for the payment of the amount he had contributed. . . . .        .

—The master, accordingly, recommended a decree as follows:

That the Beef Butchers' Association and the Beef & Mutton Butchers' Tallow Association were unincorporated associations, and were united together as the Philadelphia Butchers' Hide & Tallow Association, and that the trustees in the deeds for the respective properties referred to in the bill, hold the same in trust for the said Philadelphia Butchers' Hide & Tallow Association; and that the defendants, other than the trustees in the deeds, be enjoined and restrained perpetually from delivering possession of said properties to any person or persons, and from doing any act or acts in regard to the same to the prejudice of complainants and their associates, members of such association, and for carrying into effect the resolution of the board of trustees of December 14, 1881; and that the said trustees in the said deeds for said properties be perpetually enjoined and restrained from disturbing the complainants and their associates, members of said association, in the use and enjoyment, possession and occupation of said properties, and from selling, assigning, transferring, and conveying said properties,

Opinion of Court below.

or from encumbering the same; and that the defendant, other than the trustees under the deeds, do pay the costs, including the master's fee.

Exceptions to the report of the master, filed with and overruled by him and afterwards renewed before the court, were sustained in the following opinion, HARE, P. J.:

This case arises out of a bill filed by the complainants and a cross-bill by the defendants, who became actors to vindicate their rights. The inquiry is, which of the contending parties are equitably entitled to certain buildings that have been occupied for many years by unincorporated societies, known, among other names, as the Beef Butchers' Hide Association of Philadelphia, and the Beef & Mutton Melting Association. The question may appear a simple one; but the answer to it depends upon conflicting testimony, and a story which is so perplexing that but for the written evidence it would be difficult to arrive at a conclusion.

In the year 1849, some forty beef butchers, finding that the hides of the animals which they slaughtered could not advantageously be disposed of while raw, determined to have them cured in a building to be rented for that purpose. A suitable house was accordingly found, the hides salted and sold, and the income distributed among the members of the association in proportion to the number of the hides which each of them had contributed.

The affairs of the association were managed and the business carried on by a board consisting of a president, secretary, treasurer, and ten others, who directly or through agents salted and sold the hides and accounted for the proceeds. The plan worked well and smoothly; and, had things remained on this basis, the parties would have escaped a tedious and costly litigation. Unfortunately, the owner of the premises refused to renew the lease, and it became necessary to remove, or buy. He agreed to accept $11,500; $3,000 in cash and the rest to remain on mortgage. The managers of the association met, and, on motion of Mr. Alexander, John F. Gross, Henry Aykroyd, and J. A. Houseman were appointed a committee " to purchase the salting-house of Mr. Lex for the butchers who subscribed to the stock." The members of the association

were called on for subscriptions, and, seventeen having responded, the requisite amount was raised, handed over to the vendor, and the property conveyed by him to three persons, in trust for the only proper use and benefit of the association known by the name of the Beef Butchers' Association, and " for such persons as shall from time to time compose the same," and " for the uses and purposes, and subject to the control of the association;" and upon the further trust, " on the incorporation of the said association, to grant and convey the said described premises unto the said corporation, their successors and assignors." It seems proper to observe that two of the three persons, named in the above conveyance as trustees, were members of the committee appointed to buy for the butchers who subscribed, and the instrument presumably was drawn and should be interpreted in accordance with the instructions then received.

The contributors for the purchase of the hide-house entered into the following written agreement, showing their intention and the use to which the money was to be put: [The court here quoted the form of the subscription paper, as given on page 299, supra.]

Certificates were issued to the subscribers, in conformity to the above agreement, setting forth the sums which each had contributed, and the ·shares to which they were respectively entitled. They are in the following form: [Quoting the certificate given above, page 300.]

These instruments, the agreement under which the money was subscribed, the purchase of the hide-house with the amount so raised, and the deed of trust, are the controlling features. Viewed together, they form a consistent whole, and show that the case is not an exception to the general rule, that he who pays should be deemed the purchaser, unless the contrary is apparent. This is a natural inference, which courts of equity have raised to a presumption that may control the effect of deeds and other formally drawn instruments.

Agreeably to the deed of trust, the premises were to be held for the use of the Beef Butchers' Association, and, when they obtained a charter, to be conveyed to the resulting body corporate. This language might seem sufficiently plain, but, in applying it to the facts, we are met by the question which

arises where an attempt is made to identify the persons designated individually or collectively in a written instrument.

The answer is not always clear, where a gift is made to a man by name, or to a body corporate under the appellation conferred by its charter, but the uncertainty cannot well be greater than where, as in the present instance, the beneficiary is an unincorporated association, known by no established title, and having half a dozen aliases. Had no change occurred, the entire association, as originally constituted, might reasonably have been regarded as answering to the terms of the deed of trust, for, although passing under various appellations, the difference was not great; but the purchase of the hide-house gave birth to a new relation among the subscribers, who, although concerned like the other members in curing hides, had yet a specific interest in the buildings which had been bought with their funds.

Relying on a resolution that the purchase would be made for them, they contributed a large sum of money, which no one was personally bound to repay. The property was the only source to which they could look for reimbursement, and as they would be losers if it proved inadequate, so they might naturally expect to reap the benefit if it rose in value. Such was not, however, their only, or even a principal object. The purchase was made with a view to salting and curing the hides of the animals that they slaughtered. This was the motive which actuated them in the first instance, and they would not have consented to any arrangement tending to a different result. Had the papers been so drawn as to render them legally or equitably tenants in common, any one of their number might have instituted proceedings in partition that would have resulted in a sale and frustrated the purpose which they wished to promote. It was therefore determined to treat the buildings as so much capital, and allot the shares in the ratio of the sums contributed. Stock is a broad term, which may cover chattels, money, or land, and the owners of the stock would own the land, but without power to compel a partition or divert it from the use for which it was bought, unless a majority concurred.

It results from what has been said that, at the period when the deed of trust was executed, there were two associations,

. Opinion of Court below.

each composed of butchers, and both interested in curing hides, but differing in this respect, that one contained only such of the members of the other as were willing and able to supply the amount requisite for the purchase of the building where the business was carried on. As between two bodies thus situated, we should obviously incline to that which furnished the purchase money, and for whose use the committee who conducted the negotiations were instructed to buy.

The question after all is mainly verbal, what name shall be given to the subject of an undisputed right? For if the term, "Beef Butchers' Association of the City and County of Philadelphia," in the deed of trust, included the depositors as well as the subscribers, the members might still determine who should hold the stock, and, as certificates were only issued to the subscribers, they would own the assets, whether real or personal. Such a result was inevitable, as well as just, because the capital of the association consisted of the land and buildings which had been bought with the subscribers' money, and they would not have contributed on any other terms.

There is another consideration of equal weight. The persons equitably entitled, under the deed of trust, were confessedly those who, had a charter been obtained, would have held under it, and could have required the trustees to convey. Tried by this test there can be no doubt as to the reply. The subscribers held the entire capital, and were to form the proposed corporation. Had they been chartered, no one could have disputed their claim, and it would have been the duty of the trustees to execute a deed.

It has been contended that since the agreement between the subscribers, and the certificates which they received, speak of shares of stock, and treat the annual compensation for the use of the hide-house as interest, and not as rent, they cannot be viewed as conferring a right or title to land. This argument overlooks the fact that real estate bought by an unincorporated association, for the purposes of their trade, may be treated as capital stock, and even converted into personal property, as between the owners, if the change is convenient and will promote any beneficial object. Such a conversion does not affect the nature of the property, and merely varies the relations of the parties inter se. The amount falling due annually for the

occupation of the buildings might well be distributed as dividends or interest, without ceasing to be payable and collected as rent. There were two objects, one to establish the right of the contributors as owners, the other to define their relations among themselves; and, as the share of each depended on the sum which he had paid, the simplest way was to issue certificates of stock.

The success of the hide association led the members to unite with the mutton butchers of Philadelphia in a similar undertaking for disposing of the fat of the sheep and oxen which they turned into beef and mutton. This society, like its prototype, raised money by subscription for the purchase of a building to be held for the use of the Beef & Mutton Butchers' Tallow Association and conveyed to them when incorporated, and the contributors received certificates which were nearly in the same form as those issued by the hide association. Both companies soon afterward were fused into one, known as the Hide & Tallow Association, and brought under the control of the same officers and board.

In the year 1862 the certificates previously given were surrendered and others issued in these words : [Quoting the form of certificate given on page 303, supra.]

Like certificates were issued to those who held stock in the fat-house, with the exception that instead of the words " shares in the real estate of the hide-house property," they read, "shares in the real estate of the fat-house property." The change was formal rather than real, because, as I have already intimated, the association had no capital except the buildings, but it was probably designed to remove all doubt that the holders of the certificates were specifically interested in the real estate which had been bought with their funds.

In estimating the weight due to these instruments, it must be remembered that they came from persons who were familiar with the transactions from the outset, and acting for the members of the Hide & Tallow Association who had not, as well as for those who had, supplied the funds. No objection seems to have been made by any of the parties interested ; and if the officers and trustees of the association had no authority to vary the relations created by the deed of trust, all that they said and did with the assent of the persons interested, should be taken into view in determining what those relations were.

Arguments.

The transactions which I have outlined were such as might have been expected from the circumstances and the relative position of the parties. The associations originally formed were so loose as hardly to deserve the name. Every man following the trade of a butcher might become a member on depositing a few pounds of hides or fat, and withdraw at the end of the year or sooner, as freely as he came. There was no capital, and nothing to which the members could lay claim, except the proceeds of the stuff which they had brought to be cured or melted. The purchase of the hide-house worked no change, except that the subscribers took the place of the landlord while remaining, like the other members, tenants. So long as they had hides or fat to be prepared for market, and the rent was paid out of the proceeds, it was their interest not to eject the depositors, or take any step that would hinder the prosecution of the business which was carried on for the common good. Such was the relation of the parties for more than thirty years, and the long-continued occupancy of the buildings tended to beget the idea that the depositors were the owners, whether they had or had not paid any part of the purchase-money ; and, when the subscribers finally asserted their right, it was treated as doubtful or unfounded, and the case brought into court.

The exceptions to the master's report are sustained, and the holders of the certificates declared to be equitably entitled to the lands and building referred to in the pleadings.

A formal decree having been entered in accordance with the foregoing opinion, the Philadelphia Butchers' Hide & Tallow Association took this appeal, specifying inter alia that the court erred:

1. In reversing the master and entering the final decree.

2. In not entering, as the final decree, the one reported by the master.

*Mr. W. Horace Hepburn* and *Mr. David W. Sellers*, for the appellant:

It is manifest that all the evidence to vary the deeds was erroneously considered, no fraud, accident or mistake in drafting them being alleged: Rowand v. Finney, 96 Pa. 196; Murray v. Railroad Co., 103 Pa. 37. And the decree of the court

is in direct conflict with the terms of those deeds. Moreover, there are many facts, found by the master, which are in no way explained by the conclusions of the court below, and the findings of the court are founded upon a misconception of the evidence. When a trust is declared in the deed, at the time of the transaction, there can be no resulting trust, as the one precludes the other: 1 Perry on Trusts, § 140; Dennison v. Goehring, 7 Pa. 175. And the action of the court in sustaining the exceptions and reversing the master, without reviewing the testimony and explaining in the opinion the reasons and principles upon which the conclusions arrived at were based, is not according to the orderly course of procedure in such cases: Scheppers' App., 125 Pa. 598; Griffin's App., 109 Pa. 157; Jeanes's App., 116 Pa. 581.

*Mr. Alexander Simpson, Jr.*, and *Mr. Theodore F. Jenkins*, for the appellees:

1. The court below found the certificates to be just what they purported to be, viz., evidence of proportionate ownership in the real estate. We contend that the money paid to the certificate-holders, was not interest on a debt, but in the nature of rent for the use of the premises. The certificates in no way purport to give the holder a claim against any one to recover back the money contributed toward the purchase of the real estate, and therefore they cannot be evidence of a debt. Even if we admit that the original certificates were such, as all those alleged evidences of indebtedness were surrendered after the consolidation and merger of the hide association and the tallow association, and new certificates, in lieu thereof, were issued by the consolidated association, which contained no promise to pay anything but simply stated that the holders were entitled to so many shares in the real estate, is it not clear that the relation of debtor and creditor, in any event, ceased then, and that the former creditors became purchasers for value of the association's interest in the respective real properties? It is competent for partners by agreement among themselves to effect such a change in the ownership of joint property: Lindley on Partnership, 324.

2. The minutes of the depositors' association, in evidence before the master, support the position of the appellees, as they

show recognitions of the ownership by the stockholders of the real estate, by consulting them in regard to improvements, etc. On December 18, 1879, a committee was appointed to inquire whether, if a reduction in the rate of interest upon a mortgage against the melting-house property could be effected, the reduction would go to the benefit of the stockholders or of the depositors; and, on January 14, 1880, " the committee reported that the stockholders agreed that the depositors should have the benefit of the reduction." This conclusively shows that the stockholders were regarded as owners. There are other recognitions of such ownership. The purchasing committee who bought the hide house were appointed to purchase it " for the butchers that subscribe to the stock." The character of the depositors' association, at the time of the purchase, is inconsistent with the belief that the depositors were the owners, it being then only an association from year to year. Moreover, if the stockholders were not the owners, why did the percentage paid to them vary from time to time? The 'fact that the membership was continually changing, and that deceased or retiring members received nothing on account of the real estate, is persuasive proof that the depositors were not the owners.

3. The oral testimony for the appellees is very strong, and every act of the depositors' association for over thirty years, shows that it was believed that the instructions given to the committee to purchase "for the butchers that subscribe to the stock," had been carried out. Whatever may be the wording of the deeds, they should be construed so as to effectuate the intention with which they were taken: Story's Eq. J., §§ 64, 155. If a mistake either as to law or fact is satisfactorily shown, in consequence of which the deeds were reduced to writing in terms not conformable to the real intention of the parties, equity will reform them accordingly: Gower v. Sterner, 2 Wh. 75; Hultz v. Wright, 16 S. & R. 345; Rearich v. Swinehart, 11 Pa. 233; Fisher v. Deibert, 54 Pa. 460; Hunt v. Rousmanier, 1 Pet. 1; Lauchner v. Rex, 20 Pa. 464; Huss v. Morris, 63 Pa. 367; Cozens v. Stevenson, 5 S. & R. 421; Chew v. Gillespie, 56 Pa. 308; Gump's App., 65 Pa. 476. A mistake in the legal effect of a description in a deed, or in the use of technical language, may be relieved against: Woollan v. Hearn, 2 Lead. Cas. Eq. 985. Mistake being established, a chancel-

lor may reform the deed, or, what comes to the same thing, carry the real agreement into effect as if it had been set forth in the deed: 2 Lead. Cas. Eq., 991.

OPINION, MR. JUSTICE WILLIAMS:

There are three parties before us on the pleadings in this case: the unincorporated association, which brings this appeal, claiming to be the equitable owner of certain real estate in Philadelphia described in the bill; the defendants, who claim the equitable title to the same real estate as the holders of certificates showing the contribution of money for the purchase of it; the trustees, plaintiffs in the cross-bill, who hold the legal title to the property in controversy, and who ask the court to declare for which of the hostile claimants they hold it. The property consists of two separate lots, with the buildings and improvements upon them. One of these, known as the hide-house, was bought in 1850, and conveyed to trustees in trust for "the Beef Butchers' Association, and such persons as shall from time to time compose the same," for the uses and purposes and subject to the control of the said association. The other, known as the fat-house, was bought in 1851, and conveyed to trustees in trust for "the Beef & Mutton Butchers' Tallow Association of the City and County of Philadelphia, and such persons as shall from time to time compose the same," for the uses and purposes, and subject to the control of said association."

In 1852 the hide and the tallow business were consolidated, and the two associations united in one, by an agreement in writing, under the name of the Philadelphia Butchers' Hide & Tallow Association. The business of curing hides has been conducted at the hide-house and that of rendering tallow at the fat-house for thirty years or more with profit. The real estate has meantime more than trebled in value, and offers have been made to purchase it for other purposes. Who is entitled to the benefit of the growth in value,—the association, or the holders of the certificates? The master came to the conclusion that the association was the equitable owner of the property. The learned judge of the court below, without materially differing from the master about the facts, drew a different conclusion from them, and held that the persons holding

VOL. CXL—21

certificates were the equitable owners, and the association a mere lessee. A glance at the facts is necessary to enable us to determine which conclusion is correct.

It appears from the master's report that the business of salting hides was first entered upon, and the building afterwards purchased was at first leased by the association for its business. As the business prospered, the project of purchasing the property was suggested and discussed in the meetings of the association. A committee was appointed to make negotiations and report. They reported for what sum it could be bought, and recommended its purchase. The association then selected trustees to take the title on its behalf, and appointed a committee to raise money for the purchase. The original plan seems to have been to have each member of the association contribute. This was found impracticable, and subscriptions were accordingly made by those most able or most liberal, and each subscriber received a certificate in the following form:

"This is to certify that —— is entitled to —— shares in the stock of the Beef Butchers' Association of Philadelphia, on which five dollars per share have been paid, subject to all payments due or to become due thereon."

This was signed by the president and secretary of the association. The money represented by the certificates was paid to the treasurer of the association, and by him applied to the payment of the purchase money. The association continued in possession and occupancy of the building, paid all taxes, made improvements and repairs amounting to several thousands of dollars, and paid interest annually to the holders of the certificates during the thirty or more years before this contention arose.

The fat-house was purchased in much the same manner. The project originated in the association engaged in rendering fat. The negotiations were conducted and purchase made on its behalf, and the title placed in trustees selected by it. The purchase money was twelve thousand dollars, of which three thousand dollars was paid down, and nine thousand dollars secured by a mortgage upon it. The amount raised by subscription was six thousand one hundred and seventy-five dollars, or about one half the price of the lot, and of this but three thousand dollars were paid on the purchase money, the remainder being

Opinion of the Court.

invested in fixtures and improvements. For the money raised, certificates were issued in the following form:

"This is to certify that —— has paid for —— shares of stock in the Beef & Mutton Butchers' Melting Association of Philadelphia, at ten dollars per share, and on which the holder hereof is entitled to demand and receive six per cent interest, payable annually on the first Monday of April in each year."

This was signed by the president and secretary of the association. The holders received their interest, and the association paid the taxes, made improvements and repairs, and are still in occupancy of the fat-house.

After the consolidation, in 1862, a new form of certificate was adopted by the new association, intended to take the place of both sets previously issued, as follows:

"This certifies that —— is entitled to —— shares in the real estate of the hide-house (or fat-house) property of the Philadelphia Hide & Tallow Association, at twenty-five dollars per share, amounting to —— dollars. Transferable in person or by attorney on the books of the association. Witness the signatures of the president and secretary at Philadelphia."

These were devised for execution and in many instances were executed by the officers of the association appellant, although the word "Butchers" was omitted from the name, as stated in the body of the certificate. The master finds, however, and we are satisfied correctly finds, that there was no other organization known in connection with this business or property than the appellant, and it was its officers who were intended to execute and who accordingly executed such certificates, except as some were signed by one or more of the trustees, who had no right whatever to sign them unless it was conferred by the association.

Without going elaborately into an examination of the evidence to show how we have reached them, we shall content ourselves with stating the conclusions reached from the facts found by the master, in their natural order:

1. Each piece of real estate was negotiated for and purchased by the association doing business upon it, and the title was made to trustees of its selection, for its use, because the association making the purchase was unincorporated.

2. The money advanced by members of the association to

enable it to make the purchase, was a loan by the individual to the association of which he was a member.

3. The certificates issued to the lenders seem to have been intended to serve as evidence of the amount of money borrowed, and as an informal pledge of the property bought as security for the money advanced. They are an equitable lien upon the real estate mentioned in them, therefore, and collectively represent the lien of the vendor for so much of his purchase money as was paid by the money for which they were issued.

4. By the consolidation in 1852 the appellant succeeded to the title of both pieces, and became liable for the debts represented by both issues of certificates. The new certificates issued by it in 1862 were the mode of assuming and uniting as its own the indebtedness previously represented by both sets of outstanding certificates.

5. The trustees, therefore, hold the legal title to both pieces of property in trust for, and subject to the control of, the association appellant.

6. In case of sale by the trustees, under the direction of the association appellant, the proceeds of such sale should be applied to the payment of the outstanding certificates and accrued interest; the remainder of such proceeds should be paid into the treasury of the association.

These conclusions require us to reverse the decree made in the court below.

We adopt the decree recommended by the master, and direct the prothonotary to enter the same at length upon the record.

March 23, 1891, a motion for a re-argument was refused.